UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| TIMOTHY LEE STARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18-cv-00056-SEB-DML |
| | ) | |
| MICK RUTHEFORD, | ) | |
| ROBERT BREWINGTON, | ) | |
| JEFF MILNER, | ) | |
| JIM HASH, | ) | |
| PAUL CROCKETT, | ) | |
| PHIL SCHUETTER, | ) | |
| LINNEA PETERCHEFF, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendants' Motion for Summary Judgment [Dkt. 41], filed on April 19, 2019, pursuant to Federal Rule of Civil Procedure 56. Plaintiff Timothy Lee Stark *pro se* initiated this civil rights action against several Indiana Department of Natural Resources ("DNR") officers who, acting pursuant to Indiana law, seized a coyote and racoon in Mr. Stark's possession. Mr. Stark alleges that the U.S. Department of Agriculture's ("USDA") licensing protocols preempted Indiana statutes regulating animals. He also contends that his

1

"[c]onstitutional civil rights have been violated by an illegal seizure of [his] property by [Defendants]." [Dkt. 1, at 2].

Defendants have responded that there is no such preemption, and that the seizure of Mr. Stark's property was lawful under the Fourth Amendment. Defendants further contend that even if this Court does find a constitutional violation, they are shielded from civil liability under the doctrine of qualified immunity. For the reasons set forth below, Defendants' Motion for Summary Judgment is <u>GRANTED</u>.

## **Factual Background**

The material facts giving rise to this lawsuit are undisputed. On February 22, 2017, Department of Natural Resources ("DNR") officers Robert Brewington and Michael "Mick" Rutherford arrived at Mr. Stark's home in Charlestown, Indiana to conduct a routine game breeder's inspection. Rutherford Decl. ¶ 4. The inspection was authorized under 312 ADMIN CODE 9-10-4(p) (2019), and Mr. Stark was present at his home throughout the inspection. *Id.* at ¶¶ 4-5.

During the inspection, Officer Brewington and Officer Rutherford observed a raccoon and coyote being confined on the premises. Brewington Decl. ¶ 5. In response to their request, they were provided paperwork in the form of handwritten receipts reflecting that the animals had been donated by two individuals located from Illinois. Rutherford Decl. ¶¶ 5-6. Specifically, the coyote was reportedly

donated on April 5, 2016 from a Mr. Charles Smith residing at 392 W. Hwy. 321, Nashville, IL 62263. Stinson Decl. ¶ 10. As for the raccoon, it was allegedly donated on September 3, 2016 from a Mr. Mark Rugby residing at 112 Fairway Lane, Mount Vernon, IL 62864. *Id.* at ¶ 11. The paperwork provided by Mr. Stark to the officers was forwarded to Operations Staff Specialist Linnea Petercheff at the Department of Fish and Wildlife ("DFW"), who, along with Detective Sergeant Trent Stinson and the Indiana Intelligence Fusion Center, investigated its validity. Rutherford Decl. ¶ 7; Stinson Decl. ¶¶ 12-13.

Defendants investigation found no records of a either Charles Smith or Mark Rugby. Stinson Decl. ¶ 15. Moreover, the investigation concluded that (1) Smith and Rugby were not licensed in Illinois to possess animals, and (2) the two individuals' addresses were not legitimate Illinois addresses. Petercheff Decl. ¶ 7. Mr. Stark does not dispute any of DNR's investigatory findings. *See generally*, Stark Decl. On this basis, Ms. Petercheff concluded that the animals had been illegally obtained by Mr. Stark. Petercheff Decl. ¶ 8. Following this determination, Officer Brewington submitted an affidavit for a search warrant to the state court, which was thereafter issued. Brewington Decl. ¶¶ 9-11.

On May 2, 2017, the officers, acting pursuant to the judicially authorized search warrant, returned to Mr. Stark's property to seize the animals. [Dkt. 1 at 1]. Mr. Stark met Officer Brewington and Officer Rutherford at the gate to his

property, where he again produced the handwritten receipts and reiterated that he had taken all steps required by Indiana law to lawfully possess the animals. *Id.* at 2. Unpersuaded, the DNR officers informed Mr. Stark that the DNR had determined that the animals were being possessed illegally. Brewington Decl. ¶ 14. Mr. Stark alleges that at this point he was threatened with arrest if he failed to produce the animals in response to the officers' request. Stark Decl. ¶ 6. Additionally, Mr. Stark claims that, if there was a lawful warrant, it was never mentioned or produced to him. *Id.* at ¶ 9. After accepting the proffered cages from Officer Brewington, Mr. Stark returned with the caged animals and allowed the DNR officers to take possession of the animals. Brewington Decl. ¶¶ 15-20.

During the seizure, Officers Jim Hash, Paul Crockett, and Jeff Millner waited in the driveway leading up to the entrance of Mr. Stark's property to provide law enforcement assistance, if needed. Hash Decl. ¶ 6; Crockett Decl ¶ 6; Milner Decl. ¶ 9. Both Officer Hash and Officer Crockett remained in the driveway throughout the seizure, while Officer Millner drove up to Mr. Stark's entrance gate in order to assist officer Rutherford. Hash Decl. ¶ 6; Crockett Decl ¶ 6; Milner Decl. ¶ 10. These officers did not speak with Mr. Stark nor did they assist directly with the animal seizure. Hash Decl. ¶¶ 11-13; Crockett Decl ¶¶ 11-12; Milner Decl. ¶¶ 13-14.

The animals were taken to a licensed rehabilitator following their seizure. Petercheff Decl. ¶ 9 The rehabilitator maintained possession of the animals for no fewer than eighteen days. *Id.* at ¶ 10. During that time, the deadline for an administrative appeal passed without Mr. Stark taking any action to effectuate an appeal. *Id.* at ¶ 11. Accordingly, the animals were released into the wild. *Id.* at ¶¶ 11-12.

## ANALYSIS

### I.  Standard of Review

Summary judgment is appropriate where the are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 65(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson* 477 U.S. at 247-48. We weigh neither the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II. Discussion[1]

As previously stated, this dispute involves two issues: (1) the federal preemption of Indiana state and local laws and (2) the violation of Mr. Stark's Fourth Amendment rights.

### a. Preemption

Mr. Stark's first argument is that the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131, *et seq.* and specifically its provisions regarding USDA licensing regulations preempt State laws governing the welfare of animals. He maintains that because he was federally licensed by the USDA, which regulations required him to list all animals on his premises, the Indiana statutes regulating his animal activities are preempted by this federal law. [Dkt. 1, at 2].

As Plaintiff correctly contends, the Supremacy Clause of Article VI of the Constitution empowers the Federal Government to preempt state or local laws under certain conditions. *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986). But this power is not without limits. The Supreme Court has held that preemption generally occurs under three different scenarios. First, "[p]re-emption

---

[1] We acknowledge Defendants' objections regarding Mr. Stark's lack of adherence to local rule 56.1. Though it is "well established that *pro se* litigants are not excused from compliance with procedural rules," *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008), whether the Court holds *pro se* litigants to the consequences of violating the Court's Local Rules is a matter of discretion. *Gray v. Hardy*, 826 F.3d 1000, 1004-05 (7th Cir. 2016). While Mr. Stark clearly did not comply with the requirements of Local Rule 56.1, the more severe consequences that flow from a failure to comply with Local Rule 56-1 are not warranted here.

occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law." *See, Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Second, "preemption may occur where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 509 (1989). Finally, preemption may occur when the state law at issue conflicts with federal law, either (i) because it is impossible to comply with both, or (ii) because the state law stands as an obstacle to the accomplishment and execution of congressional objectives. *Id.* Importantly, the critical question in any preemption analysis is always whether Congress intended that federal regulation supersede state law. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230. (1947).

Here, none of the "varieties" of preemption is applicable. *Louisiana Pub. Serv. Comm'n* 476 U.S. at 357. As a preliminary matter, we note that the state and local laws at issue fall within the category of public welfare, health, and safety—areas of law that states have traditionally occupied under their historic police powers. *Rice*, 331 U.S. at 230. Therefore, we begin with the assumption that the historic police powers of the states were not to be superseded by the AWA unless that was the clear and manifest purpose of Congress. *Id.* As for the intent of Congress in these circumstances, Seventh Circuit precedent—which we are bound to follow—directs that the AWA does not evince an intent to preempt state or local

regulation of animals or public welfare. *DeHart v. Town of Austin, Ind.*, 39 F.3d 718, 722-23 (7th Cir.1994). To the contrary, the Congressional intent was to foster federal cooperation with state and local governments, not to exclude state and local governments entirely from the field.[2] *Id.* at 722.

That leaves only the final preemption possibility: whether the state law at issue conflicts with federal law. Again, plaintiff argues that because he was federally licensed under the USDA, he was exempt from the Indiana laws relating to animal and public welfare.[3] But, the AWA does not prohibit "any State…from promulgating standards in addition to those standards promulgated by the Secretary [of Agriculture]." 7 U.S.C. § 2143(a)(8).[4] Furthermore, for preemption to take place, there must be a "physical impossibility" between the AWA and Indiana state and local laws. *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987). No such impossibility exists here. The AWA simply does not provide

---

[2] Courts across jurisdictions are in general agreement with the Seventh Circuit on this issue. *Kerr v. Kimmell*, 740 F.Supp. 1525, 1529–30 (D.Kan.1990) (concluding that the AWA did not preempt state licensing scheme for sale and breeding of dogs); *Am. Canine Found. v. Sun*, 2007 WL 4208358, at *5 (N.D.Cal. Nov. 27, 2007) (finding that the AWA did not preempt local ordinance that required a mandatory spaying and neutering program).

[3] Plaintiff has not pointed to, and this Court could not locate, any state or local law precluding animal registration under both the USDA and Indiana applicable laws. To the extent that Plaintiff is alluding to IND. ADMIN CODE. 9-10-9(y), this Court cannot agree that generally disallowing the transference of wild animals to a permit holder's game breeder's license creates the requisite physical impossibility between state and federal law, as this would be inapposite to the stated purpose and goals of the AWA.

[4] As the Second Circuit explained, the "AWA sets the floor, not the ceiling, for USDA license holders." *New York Pet Welfare Ass'n, Inc. v. City of New York*, 143 F. Supp. 3d 50, 60 (E.D.N.Y. 2015), *aff'd*, 850 F.3d 79 (2d Cir. 2017). Mr. Stark cannot rely solely on his USDA license to prevail on his federal preemption claim. *Id.*

an unqualified right to USDA license holders to buy, retain, or sell animals in Indiana, without complying with applicable state regulations.

Accordingly, because all of Plaintiff's preemption are unavailing, we find no preemption between the AWA and Indiana animal welfare laws.

### b. Qualified Immunity

Defendants also argue in their motion that there was no violation of either (1) Mr. Stark's possessory rights in his animals or (2) his Fourth Amendment rights against unreasonable search and seizure. Defendants further contend that, even if there was a constitutional violation, they would be shielded from civil liability by the doctrine of qualified immunity. We agree.

Title 42 U.S.C. § 1983 imposes liability on "[e]very person" who "subjects or caused to be subjected" another to the deprivation of federal rights under color of state law. Qualified immunity protects public officials like these Defendants from civil liability under § 1983 unless the official's conduct violated "a clearly established" constitutional right. *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The recognition of a qualified immunity defense reflects an attempt to balance competing values: the importance of a damages remedy to protect the rights of citizens against the need to protect officials who are required to exercise discretion and the related public interest in encouraging the vigorous exercise of official authority. *Fitzgerald*, 457

U.S. at 807. Qualified immunity "gives ample room" for Defendants' mistaken but still reasonable judgments. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

Qualified immunity consists of two separate but related inquiries: (1) whether a defendant violated a constitutional right and (2) whether the right was clearly established at the time of the violation. *Id.* (*citing McComas v. Brickley*, 673 F.3d 722, 725). We discuss both Plaintiff's possessory rights in his animals and his Fourth Amendment rights, in turn.

First at issue is Plaintiff's possessory rights in the subject coyote and racoon. As applied to the undisputed facts, the Defendants can only be found liable if Plaintiffs possessory rights in the animals were so obvious that a reasonable DNR official would understand that seizing the animals would violate those rights.

We cannot say that any reasonable DNR official would understand the circumstances presented here as violative of Plaintiff's possessory rights in his animals. Plaintiff does not dispute the DNR findings that the individuals he reportedly received the animals from did not exist. Nor does he dispute the finding that he did not notify the DNR within five days of obtaining the two animals at issue, as required under 312 IND. ADMIN. CODE 9-10-4(f). Thus, Plaintiff did not "lawfully acquire" the relevant animals as required under 312 IND. ADMIN CODE 9-10-4(h) and consequently could not have had any possessory rights in them. DNR officers are permitted to confiscate animals when, as here, the license holder fails

10

to correct the violations of the license requirements. 312 IND. ADMIN. CODE 9-10-4(r)(3). Pursuant to these regulations and the uncontroverted evidence establishing that Mr. Stark illegally acquired the animals, we easily conclude that Mr. Stark's possessory rights in the animals were not so obvious that a reasonable DNR official would understand that the taking of Mr. Stark's illegally acquired animals would violate those possessory rights. Indeed, the record establishes to the contrary—that Mr. Stark had *no* possessory rights in either animal.

That leaves only the issue of whether Plaintiff's Fourth Amendment rights were violated when the officers seized the animals. As a preliminary matter, we note Mr. Stark seems only to argue violations of his Fourth Amendment rights with respect to the seizure of the two animals. [Dkt. 1 at 2]. But, the "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *U.S. v. McNeal*, 77 F.3d 938, 945 (7th Cir. 1996). Because Plaintiff had no possessory interest in the animals, he cannot claim an expectation of privacy therein. Accordingly, no Fourth Amendment violation has occurred with respect to the seizure of these animals.

Even if Mr. Stark somehow had a valid possessory interest in the animals, the Supreme Court has explained that "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes

difficult for an officer to determine how the relevant doctrine…will apply to the situation the officer confronts." *Escondido, Cal. V. Emmons*, 586 U.S. ___, 139 S. Ct. 500, 503 (2019). Thus, to hold an officer civilly liable, the Supreme Court has instructed lower courts to "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Id.* at 504 (internal citations omitted). Alternatively, qualified immunity may not apply where there is evidence that the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know that without guidance from the courts. *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (1993). In all, if Defendants actions are not "beyond debate," they are generally afforded protection under the principles of qualified immunity. *Escondido, Cal* 139 S. Ct. at 504.

Here, Mr. Stark has not supplied, and we have been unable to locate, any existing precedent holding that DNR officials act unconstitutionally when they seize illegally acquired animals, particularly when they acted pursuant to a valid search warrant.[5] While Plaintiff contends that he was not shown the search warrant throughout the entirety of the search, it is not clearly established that government

---

[5] To the extent that Mr. Stark also argues that the search warrant did not exist, he has pointed to no evidence supporting this allegation nor has he disputed Defendants evidence proving the existence of a valid search warrant. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted). ("[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts….Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial").

officials are constitutionally required to do so in these circumstances.[6] *See*, e.g. *United States v. Grubbs*, 547 U.S. 90, 99, 126 S. Ct. 1494, 1501, 164 L. Ed. 2d 195 (2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 481–482) ("The Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, *ex ante*, the "deliberate, impartial judgment of a judicial officer ... between the citizen and the police,"). Without a specific case establishing that these actions by the DNR officers constitute violations of one's Fourth Amendment rights, we cannot find that Defendants violated a clearly established right.[7]

Moreover, Plaintiff has not pointed to any conduct that could be deemed so patently offensive that a reasonable DNR officer would know of its unconstitutionality without guidance from the courts. *Pieschek*, 3 F.3d at 1053. DNR officers "ha[ve] the power to enforce Indiana laws and may exercise all powers granted by law to state police officers, sheriffs, and members of police

---

[6] We do note that Fed. R. Crim. P. 41(f)(C) requires that officers executing a search warrant "give a copy of the warrant and a receipt for the property taken to the person from whom…the property was taken." However, it is not clearly established that DNR officers are subject to the Rules of Criminal Procedure, especially when the search and seizure falls within the civil context.

[7] Because we hold that the DNR officials did not violate a clearly established right when acting pursuant to a valid search warrant, we need not consider the issue of consent. We note, however, that (1) a search warrant may not be needed—much less shown—if the party voluntarily consents to the search, *Scheckloth v. Bustamonte*, 412 U.S. 218, 222 (1973), and (2) threats do not necessarily invalidate consent when they are "firmly grounded." *United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992).

13

departments." IND. CODE § 14-9-8-17(4). Here, it is clear that the DNR officers exercised those powers to confiscate Mr. Stark's illegally obtained animals in accordance with 312 IND. ADMIN. CODE 9-10-4(r)(3). Therefore, the Court cannot say that Defendants' acts were patently violative of Mr. Stark's Constitutional rights.

Accordingly, our inescapable conclusion is that Summary Judgment must be granted in favor of Defendants.

## **Conclusion**

For the reasons detailed above, Defendant's Motion for Summary Judgment [Dkt. 41] is <u>GRANTED</u>. The parties shall bear their own costs, respectively. Final Judgment will enter by separate document. Fed. R. Civ. P. 58(a).

IT IS SO ORDERED.

Date: 3/3/2020

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

TIMOTHY LEE STARK
3320 Jack Teeple Road
Charlestown, IN 47111

Bryan Findley
INDIANA ATTORNEY GENERAL
bryan.findley@atg.in.gov

Mollie Ann Slinker
INDIANA ATTORNEY GENERAL
mollie.slinker@atg.in.gov